IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


FRED W. FIELDS,                                    Civ. No. 02-975-AA

        Plaintiff,                                 OPINION AND ORDER

    v.

THREE CITIES RESEARCH, INC., a
Delaware corporation; COE FUNDING,
INC., a Delaware corporation;
THREE CITIES FUND III, L.P., a
Delaware limited partnership; TCR
FRIENDS III, L.P., a Delaware
limited liability company; and
TCR CO-INVESTORS III, L.L.C., a
Delaware limited liability company,

        Defendants.

_____

Peter C. Richter
Joshua M.F. Sasaki
Justin C. Sawyer
MILLER NASH LLP
3500 U.S. Bancorp Tower
111 S.W. Fifth Avenue
Portland, OR 97204
        Attorneys for plaintiff

1    - OPINION AND ORDER

David G. Hosenpud
LANE POWELL P.C.
Suite 2100
601 S.W. Second Avenue
Portland, OR  97204

J. William Koegel, Jr.
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, DC 20036
    Attorneys for defendants Three Cities Research, Inc., Coe
    Funding, Inc., Three Cities Fund III, L.P., TCR Friends III,
    L.P., and TCR Co-Investors III, L.L.C.

AIKEN, Judge:

    Plaintiff Fred Fields alleges claims against defendants
arising from the sale of stock in plaintiff's business, The Coe
Manufacturing Company, to a holding company, CMC Acquisition
Company, and the subsequent transfer of Coe stock to another
holding company, Coe Funding, Inc.  Plaintiff asserts a claim of
tortious inference with contract against Three Cities Research,
Inc., claims of successor liability and fraudulent transfer against
Coe Funding, Inc., and claims of tortious interference with
contract and shareholder liability against Three Cities Fund III,
L.P., TCR Friends III, L.P., and TCR Co-Investors III, L.L.C.
(collectively referred to as the Funds).  Plaintiff seeks to hold
the Funds liable for CMC Acquisition Company's alleged breaches of
contract and for Coe Funding, Inc.'s alleged fraudulent transfers.

    All defendants move for summary judgment on all claims, and
plaintiff moves for summary judgment on Coe Funding, Inc.'s
counterclaim for rescission.

<u>I.  BACKGROUND</u>

The underlying facts of this case have been recited numerous times by the parties and the court.  However, given the dispositive nature of the current motions, the court is inclined to do so again, albeit without the detail provided in the parties' submissions.  <u>See generally</u> plaintiff's memoranda in opposition to defendants' motions for summary judgment.

Plaintiff is an Oregon resident and former owner of The Coe Manufacturing Company (Coe).  Coe is an Ohio corporation that manufactures capital equipment and machinery for customers who manufacture gypsum, lumber, engineered lumber, composite board, and rubber composites.

Defendant Three Cities Research, Inc. (TCR) is a Delaware corporation with its principal place of business in New York.  TCR is a private equity firm that advises investment funds and manages investments of capital in various medium-sized businesses operating in established industries.

Defendant Three Cities Fund III, L.P., (TCF III) is a Delaware limited partnership, with its principle place of business in New York.  The general partner of TCF III is TCR Associates III, L.L.C., a Delaware limited liability company.  The managing member of TCR Associates III is TCR GP L.L.C., a Delaware limited liability company.

Defendant TCR Friends III L.P. is a Delaware limited

partnership with its principal place of business in New York. The general partner of TCR Friends III is TCR Associates III.

TCR Co-Investors III, L.L.C. is a Delaware limited liability company with its principal place of business in New York.

TCR, through its executives and partners, manages the Funds' investment portfolio and renders investment and management advice. TCR does not make final decision for the Funds; rather, the Funds make decisions through the managing members of their general partner.[1] Those managing members are Willem de Vogel, Thomas Weld, and Bill Uhrig.

Willem de Vogel holds the title of President at TCR, TCR Management, Inc., and CFI. De Vogel also manages TCF III and is the managing member of both TCR GP and TCR Co-Investors III and a member of TCR Associates III.

CMC Acquisition Company (CMC) is a holding company incorporated under the laws of Delaware in October 1999. CMC was formed by the Funds to acquire Coe from plaintiff. TCF III owned ninety-five percent of CMC's stock, with TCR Friends III and TCR Co-Investors III each owning two percent.[2] The original directors of CMC were Jeannette Welsh, W. Robert Wright, and H. Whitney

---

[1]The court is not completely clear as to the identity of this general partner or its precise relationship to the Funds.  See Declaration of Peter Richter, Ex. 1, pp. 14-17 (de Vogel Dep. pp. 48-52).

[2]The remaining stock was held by yet another holding company, Composicorp Holdings LLC, a Florida limited liability company.

Wagner. Gus Fornataro and Darryl Dillenback were later appointed.

Coe Funding, Inc. (CFI) is a holding company incorporated under the laws of Delaware in 2002. CFI was formed by the Funds to acquire Coe preferred convertible stock. The directors of CFI are de Vogel, Wright, and Welsh.

In late 1999, TCR representatives - primarily de Vogel - negotiated the possible acquisition of Coe from plaintiff. During these negotiations, TCR and de Vogel acted on behalf of the Funds.

On April 28, 2000, plaintiff sold all shares of Coe common stock to CMC for $66,484,486 pursuant to a Stock Purchase Agreement dated March 8, 2000. Plaintiff received approximately $55,000,000 in cash and agreed to accept a Subordinated Note (Seller Note) from CMC, dated April 28, 2000, under which CMC would pay plaintiff $10,000,000 plus interest over five years. The parties also negotiated a Consulting and Noncompetition Agreement between Coe and plaintiff, under which Coe would pay plaintiff $5,450,000 over three years. CMC accepted the terms of a Guaranty to secure Coe's performance under the Consulting Agreement.

The Seller Note was subordinate to a portion, if not all, of CMC's senior debt, including $20 million in financing provided by GMAC Business Credit LLC (GMAC). The GMAC debt is secured by all of Coe's assets.

On October 27, 2000, de Vogel wrote plaintiff and accused him of deliberately misrepresenting and omitting material facts about

Coe's financial status and fraudulently inducing CMC to purchase Coe. Immediately thereafter, CMC and Coe suspended payments to plaintiff and claimed millions of dollars in damages caused by plaintiff's fraud and misconduct. After CMC and Coe failed to pay plaintiff under the Seller Note, Guaranty, and Consulting Agreement, plaintiff accelerated the due dates under those agreements.

In July 2001, plaintiff filed suit against CMC, alleging breach of the Seller Note and CMC's Guaranty of the Consulting Agreement. <u>Fields v. CMC Acquisition Co.</u>, Civ. No. 01-1131-AA (D. Or. 2001). CMC counterclaimed for fraudulent inducement and breach of representation and warranties.

On February 22, 2002, Coe adopted resolutions and amendments to its Articles of Incorporation authorizing the issuance and sale of 30,000 shares of Series A convertible preferred stock to CFI for $3,000,000. CMC, as the sole shareholder of Coe, approved the amendment and resolution to Coe's Articles of Incorporation authorizing the stock issuance. CFI was formed by two of the Funds companies, TCF III and TCR Friends III, and TCR GP to purchase the newly-issued Coe stock, with TCF III holding over ninety percent of CFI stock.

After the Coe stock transaction, CFI's stock holdings in Coe constituted ninety-seven percent equity ownership of Coe upon conversion. Thus, CMC's equity ownership of Coe arguably was

diluted from 100 percent to approximately three percent.

Defendants maintain that the purpose of the Coe stock transfer and the cash infusion was to provide much-needed capital to Coe, because it was experiencing severe operating losses and could not meet its ordinary expenses. Plaintiff does not deny the fact that Coe was experiencing financial difficulties but generally disputes the underlying causes asserted by defendants.

On or about June 14, 2002, CMC filed a Chapter 7 bankruptcy petition in the District of Delaware, and plaintiff's suit against CMC was stayed. CMC admitted that it filed for bankruptcy to end the litigation with plaintiff. CMC's bankruptcy proceeding was subsequently transferred to the District of Ohio.

On July 22, 2002, plaintiff filed this action against TCR, TCF III, TCR Friends III, TCR Co-Investors III, TCR GP, TCR Management, Inc., de Vogel, and the directors and officers of CMC. In an Opinion and Order dated July 2, 2003, the court dismissed all claims except for the claim of tortious interference alleged against TCR.

On August 1, 2002, plaintiff filed suit against Coe Manufacturing for breach of the Consulting Agreement. That action remains pending before this court. See Fields v. Coe Manufacturing Co., Civ. No. 02-1025-AA (D. Or. 2002).

In late 2003, plaintiff attempted to purchase CMC's assets, including CMC's claims against plaintiff and the trustee's

avoidance powers.  The bankruptcy trustee initially moved for leave
of court to sell CMC's assets to plaintiff but later withdrew the
motion after receiving a higher offer.  On December 19, 2003, the
bankruptcy trustee held an auction for CMC assets, and plaintiff
actively participated in the bidding.  Ultimately, CFI purchased
CMC's assets for $560,000.

In an Opinion and Order dated May 25, 2004, the court allowed
plaintiff to amend his complaint and add additional claims of
tortious interference, fraudulent transfer, successor liability and
shareholder liability based on corporate veil-piercing.  CFI
counterclaimed for fraudulent representation and inducement and
seeks rescission or damages.  In an Opinion and Order dated October
6, 2004, the court dismissed plaintiff's claim of tortious
interference alleged against CFI.

Defendants move for summary judgment on all remaining claims,
and plaintiff moves for summary judgment on CFI's counterclaim of
rescission.  Trial is scheduled to commence on April 25, 2005.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if pleadings, depositions,
answers to interrogatories, and admissions on file, together with
the affidavits, if any, show that there is no genuine issue as to
any material fact and that the moving party is entitled to judgment
as a matter of law."  Fed. R. Civ. P. 56©).  In reviewing a motion
for summary judgment, the court must draw all reasonable inferences

supported by the evidence in favor of the non-moving party. <u>Villiarimo v. Aloha Island Air, Inc.</u>, 281 F.3d 1054, 1061 (9th Cir. 2002). The moving party has the burden of establishing the absence of a genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). Where competing factual inferences are equally plausible, summary judgment is inappropriate. <u>Sicor Ltd v. Cetus Corp.</u>, 51 F.3d 848, 857 (9th Cir. 1995).

If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. <u>Id.</u> at 324. A fact issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). The Ninth Circuit has refused to find a genuine issue where the only evidence presented is "uncorroborated and self-serving" testimony. <u>Kennedy v. Applause, Inc.</u>, 90 F.3d 1477, 1481 (9th Cir. 1996).

### III. DISCUSSION

#### A. TCR's Motion for Summary Judgment

TCR moves for summary judgment against plaintiff's claim for tortious interference. Plaintiff alleges that TCR, through de Vogel and other TCR employees, provided CMC with false information regarding the economic viability and status of Coe and caused CMC to repudiate its obligations under the Seller Note and Guaranty. Plaintiff also alleges that TCR caused CMC and Coe to fraudulently

transfer CMC's sole asset - ownership of Coe stock - to CFI for no consideration, thereby interfering with plaintiff's attempts to obtain a remedy for CMC's breach of the Seller Note and Guaranty.

Under Oregon law, a party may recover damages for wrongful interference with a contract. Wampler v. Palmerton, 250 Or. 65, 439 P.2d 601 (1968). The interest protected by the tort is "the interest of the individual in the *security and integrity of the contractual relations* into which he has entered." Id. at 73, 439 P.2d at 605 (emphasis added). To state a claim for intentional interference with a contract, plaintiff must establish the following elements:

> (1) the existence of a professional or business relationship . . . (2) intentional interference with that relationship, (3) by a third party, (4) accomplished through improper means or for an improper purpose, (5) a causal effect between the interference and damage to the economic relationship, and (6) damages.

McGanty v. Staudenraus, 321 Or. 532, 535, 901 P.2d 841, 844 (1995).

Here, plaintiff alleges that TCR intentionally interfered with the Stock Purchase Agreement and Seller Note between plaintiff and CMC. Plaintiff claims that TCR falsely accused plaintiff of materially misrepresenting Coe's financial status and fraudulently inducing CMC to buy Coe. Plaintiff maintains that TCR did so with the intent of causing CMC to suspend payments under the Seller Note, and that CMC relied on TCR's statements in refusing to honor its obligations.

Plaintiff relies on the October 27, 2000 letter to plaintiff

10   - OPINION AND ORDER

from de Vogel, in which de Vogel describes plaintiff's alleged misrepresentations and indicates that he advised CMC and Coe to suspend payments under the agreements with plaintiff. Declaration of Gwendolyn Prothro (Prothro Decl.), Ex. 6. Plaintiff maintains that this letter establishes that TCR told CMC that plaintiff had engaged in fraudulent conduct, and that TCR advised CMC and Coe to suspend payments to plaintiff based on this information. <u>Id.</u>; <u>see also</u> Declaration of Peter C. Richter (Richter Decl.), Ex. 1, p. 30 (de Vogel Dep. p. 140) (testifying that he so advised CMC and Coe).

TCR argues that plaintiff cannot establish interference by a third party to the contract, because de Vogel was acting as a representative for CMC when he wrote the October 27 letter and advised CMC to suspend payments under the Seller Note. <u>See</u> <u>McGanty</u>, 321 Or. at 537, 901 P.2d at 845 (a party to a contract cannot be liable for tortious interference). TCR relies on the deposition testimony of Wright, then President of CMC, who stated that he "probably" drafted the October 27 letter (signed and delivered by de Vogel), and that he, not de Vogel, made the decision to suspend payments to plaintiff. Richter Decl., Ex. 6, p. 7 (Wright Dep. p. 71). TCR also argues that the October 27 letter was authorized by the terms of the Stock Purchase Agreement, in that the Agreement required the parties to give notice of claims before pursuing litigation.

I first note that plaintiff does not rely solely on the

October 27 letter to support this claim. Rather, plaintiff relies on the letter as evidence that TCR representatives, including de Vogel, told CMC that plaintiff misrepresented Coe's financial status and fraudulently induced CMC to purchase Coe. Wright admitted that he had no personal knowledge of plaintiff's alleged misrepresentations and instead relied on information provided from TCR in making his decision to suspend payments. Richter Decl., Ex. 6, pp. 9-14 (Wright Dep. pp. 72-74, 80-81, 86).

I further find that a question of fact exists as to whether de Vogel was acting on behalf of CMC when he wrote the October 27 letter. De Vogel's letter was not copied to Wright or any other CMC director or officer. Although CMC officers represent that TCR acted as CMC's representative in dealing with plaintiff, they do not specify *when* TCR or de Vogel was authorized to acted on CMC's behalf. Not until July 2001 did CMC formally appoint TCR as its representative in discussing the dispute with plaintiff and potential resolutions. Richter Decl., Ex. 54.

Granted, in the October 27 letter de Vogel uses the pronoun "we" when discussing the purchase of Coe and the suspension of payments, implying that "we" means CMC. However, when negotiating the purchase of Coe, de Vogel was acting on behalf of the Funds; CMC had not yet been formed. De Vogel was also the advisor and investment manager for the Funds, and de Vogel testified that he wore "different hats" when dealing with the Funds, CMC, CFI, and

Coe. Richter Decl., Ex. 1, p. 16 (de Vogel Dep. p. 50). Moreover, de Vogel testified that he stated to "our investors that we had a dispute with the seller of Coe Manufacturing." Id. at p. 23 (de Vogel Dep., p. 62.) Construing these facts in favor of plaintiff, de Vogel's use of "we" could mean the Funds rather than CMC.

TCR next argues that its allegedly defamatory statements are conditionally privileged, because they were of mutual concern to TCR, Coe and CMC, and the statements were made to protect the interests of CMC and Coe. An alleged defamatory statement is subject to a qualified or conditional privilege if it pertained to a subject of mutual concern to the defendant and the person to whom the statement was made. Wattenburg v. United Med. Labs., Inc., 269 Or. 377, 380, 525 P.2d 113, 114 (1974); Lund v. Arbonne Int'l, Inc., 132 Or. App. 87, 95, 887 P.2d 817, 824 (1994) ("A statement that is otherwise defamatory is privileged if it is uttered under such circumstances that the law grants immunity to the speaker."). Here, TCR presents evidence that its statements were of mutual concern, because TCR negotiated CMC's purchase of Coe and acted as Coe's financial advisor. However,

> [T]he privilege may be lost if the speaker does not believe that the statement is true or lacks reasonable grounds to believe that it is true; if it is published for a purpose other than that for which the particular privilege is given; if the publication is made to some person not reasonably believed to be necessary to accomplish the purpose; or if the publication includes defamatory matter not reasonably believed to be necessary to accomplish the purpose.

<u>Lund</u>, 132 Or. App. at 96, 887 P.2d at 823.

Plaintiff argues that TCR had no reasonable grounds to believe that plaintiff misrepresented the financial status of Coe and further maintains that TCR made such statements in an effort to avoid CMC's liability to plaintiff. Plaintiff points out that TCR conducted a due diligence analysis of Coe prior to its purchase and became aware of issues that TCR later claims plaintiff misrepresented. Richter Decl., Ex. 8, p. 3 (Weld Dep. p. 61); Ex. 55. Further, de Vogel did not discuss allegations contained in the October 27 letter with one of the consultants hired to conduct the due diligence investigation of Coe. Richter Decl., Ex. 2, pp. 17-18 (Hickey Dep. p. 145-46). Although TCR presents contrary evidence regarding its investigation of Coe's financial condition, <u>see</u> Prothro Decl. Exs. 8, 10, Declaration of Daniel Hornbarger, whether TCR's statements are conditionally privileged involves questions of fact which cannot be resolved on a summary judgment motion.

Finally, TCR argues that statements in the October 27 letter are absolutely privileged as statements made in preparation for litigation between CMC and plaintiff. Plaintiff argues that the absolute privilege does not apply, because the letter was a wrongful initiation of litigation rather than a legitimate settlement proposal. Although "the prosecution of unfounded litigation constitutes actionable 'improper means' for purposes of

tortious interference," plaintiff must establish that "the antecedent proceedings" were terminated in his favor. <u>Mantia v. Hanson</u>, 190 Or. App. 412, 429, 79 P.3d 404, 414 (2003). Here, the "antecedent proceedings" would be CMC's (now CFI's) counterclaims for fraudulent representation and inducement, and these claims have yet to be resolved or "terminated."

Regardless, I find that questions of fact remain as to whether either TCR or de Vogel was authorized to send the October 27 letter or otherwise act on CMC's behalf. Therefore, I deny TCR's motion to dismiss plaintiff's claim for tortious interference based on TCR's allegedly defamatory statements to CMC.

TCR also moves for summary judgment on plaintiff's claim for tortious interference based on CFI's acquisition of Coe stock. Plaintiff alleges that TCR "caused" CMC and Coe to engage in a fraudulent stock transaction to deny plaintiff a remedy for CMC's breach. Amended Complaint, ¶ 45. In granting CFI's previous motion to dismiss plaintiff's tortious interference claim, I found that CFI's involvement in the allegedly fraudulent transfer of Coe stock did not interfere with or cause damage to the business relationship between plaintiff and CMC, because CFI's actions did not induce or cause CMC to breach its contractual duties. Rather, the damage to plaintiff's contractual relationship with CMC occurred in October 2000, when CMC stated its intent to suspend payments under the Seller Note, or in January 2002, when CMC

asserted counterclaims of fraud against plaintiff. The court must look to the interference with the business relationship of the parties rather than any interference with one party's ability to collect damages sustained as a result. See <u>Fox v. Country Mut. Ins. Co.</u>, 169 Or. App. 54, 74-75, 7 P.3d 677, 690 (2000); <u>Lund</u>, 132 Or. App. at 94, 887 P.2d at 832 ("The defendant's interference must affect a relationship between the plaintiff and a third party.").

Moreover, plaintiff fails to establish how TCR "caused" CMC or Coe to engage in a fraudulent stock transfer. Rather, plaintiff simply argues that "[b]y intentionally stripping CMC of its assets and putting it into bankruptcy, *defendants* prevented Fields from realizing the full benefit of his contracts . . . ." Plaintiff's Corrected Memorandum in Opposition to TCR's Motion for Summary Judgment, p. 34 (emphasis added). Plaintiff does not explain how TCR, specifically, stripped CMC of its assets. Therefore, plaintiff's claim of tortious interference based on the transfer of Coe stock to CFI must fail.

## B. CFI's Motions for Summary Judgment

### 1. Successor in Interest

Plaintiff alleges that CFI became CMC's successor in interest and may be held liable for CMC's debts. Plaintiff argues that CFI is a "mere continuation" of CMC, and the transfer of Coe stock to CFI was a fraudulent transaction carried out to deny plaintiff a remedy for CMC's contractual breach. A purchasing corporation may

be held responsible for the selling corporation's obligations if: 1) the purchasing corporation expressly or impliedly agrees to assume those liabilities; 2) the transaction amounts to a consolidation or merger of the corporations; 3) the purchasing corporation is merely a continuation of the selling corporation; or 4) the corporations entered the transaction to escape liability. Welco Indus., Inc. v. Applied Companies, 617 N.E.2d 1129, 1132 (Ohio 1993); Elmer v. Tenneco Resins, Inc., 698 F. Supp. 535, 540 (D. Del. 1988); Erickson v. Grande Ronde Lumber Co., 162 Or. 556, 568, 92 P.2d 170, 174 (1939).

As I found in granting plaintiff's motion to amend, plaintiff cannot rely on CFI's purchase of CMC's assets in the bankruptcy proceeding to support this claim, and plaintiff does not allege that the stock transaction constituted a consolidation or merger of CFI and CMC. However, I reconsider my previous implication that plaintiff cannot rely on the mere continuation theory, because neither CMC nor Coe ceased to exist. See Continental Ins. Co. v. Schneider, Inc., 810 A.2d 127, 134 (Pa. Super. 2002); IGL-Wisconsin Awning, Tent and Trailer Co., Inc. v. Greater Milwaukee Air and Water Show, Inc., 520 N.W.2d 279, 280 (Wis. App. 1994). Other jurisdictions do not necessarily require a transfer of all assets or a cessation of the transferor company:

> The "mere continuation" exception applies when there is
> a continuation of directors and management, shareholder
> interest, and, in some cases, inadequate consideration.
> Thus, the test for determining whether this exception

applies focuses on whether the purchasing corporation is,
in effect, a continuation of the selling corporation, and
not whether there is a continuation of the seller's
business operation.

Alcan Aluminum Corp. v. Elec. Metal Prods., Inc., 837 P.2d 232, 283

(Colo. App. 1992) (citation omitted).  "To be a mere continuation,

California courts require evidence of one or both of the following

factual elements: (1) a lack of adequate consideration for

acquisition of the former corporation's assets to be made available

to creditors, or (2) one or more persons were officers, directors,

or shareholders of both corporations."  Katzir's Floor and Home

Design, Inc. v. M—MLS.com, 394 F.3d 1143, 1150 (9th Cir. 2004).

Accordingly, I deny summary judgment on plaintiff's mere

continuation theory at this time.  At the close of evidence, I will

decide whether the relevant forums allow a claim of successor

liability under this theory based on the evidence presented.  The

parties are invited, but not required, to provide the court with

additional authority.

Plaintiff further alleges successor liability based on CMC's

approval of the Coe stock transaction, the Funds' formation of CFI,

and CFI's acquisition of Coe stock.  CFI argues that this theory

must fail, because no "assets" were transferred from CMC to CFI.

Plaintiff responds that assets were transferred, albeit through an

indirect stock dilution rather than through a sale or direct

transfer from CMC to CFI.

This court has found successor liability based on a complex

series of corporate restructuring and stock transfers.  _See_ _Schmoll_
_v. ACandS, Inc._, 703 F. Supp. 868 (D. Or. 1998).  In so holding,
the court noted "two important principles of Oregon law that are
directly applicable.  First, . . . the Oregon courts are more
concerned with the substance of a transaction than its particular
form.  Second, Oregon law rejects corporate restructuring carried
out to escape liability."  _Id._ at 872 (citing _Dairy Coop. Ass'n v._
_Brandes Creamery_, 147 Or. 488, 496, 30 P.2d 338, 341 (1934)).
Defendant presents no cases from either Ohio or Delaware – the two
alternative choice of law forums – inconsistent with these
principals.

Although the alleged transaction in this case differs in some
respects from that in _Schmoll_, important similarities remain.
Prior to the stock transfer, CMC's sole asset was 100 percent
ownership of Coe stock.  After the transfer, CFI's sole asset was
ninety-seven percent equity ownership in Coe.  Thus, CFI arguably
possessed the same asset once held by CMC, controlling ownership of
Coe, without the contractual obligations owed to plaintiff.
Further, the shareholders of CMC were TCF III, TCR Friends III, and
TCR Co-Investors III, with TCF III holding ninety-five percent of
the stock.  The shareholders of CFI are TCF III, TCR Friends III,
and TCR GP, with TCF III holding over ninety percent of CFI stock.
Thus, the Funds' collective position as controlling shareholders of
Coe's parent company was not altered by the stock transaction.  _See_

<u>Schmoll</u>, 703 F. Supp. at 872-73.  I recognize that plaintiff's theory is rather novel; plaintiff may nevertheless proceed with this claim.

### 2.  Fraudulent Transfer

Plaintiff alleges that CMC indirectly transferred the majority of its assets - Coe stock - by approving the stock transaction between Coe and CFI, with the intent to hinder, delay, or defraud plaintiff.

The relevant forums all have adopted the Uniform Fraudulent Transfers Act (UFTA).  The UFTA renders fraudulent a transfer that is made "[w]ith actual intent to hinder, delay or defraud any creditor of the debtor."  DEL. CODE ANN. tit. 6 § 1304(a); <u>see also</u> OHIO REV. CODE ANN. § 1336.04(A)(1); Or. Rev. Stat. § 95.230(1).  The UFTA further defines "transfer" as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset . . . ."  DEL. CODE ANN. tit. 6 § 1301(12); OHIO REV. CODE ANN. § 1336.01(L); Or. Rev. Stat. § 95.200(12).  A claim for fraudulent transfer may be brought against the recipient of the assets.  DEL. CODE ANN. tit. 6 § 1308(b); OHIO REV. CODE ANN. § 1336.08(B); Or. Rev. Stat. § 95.270(2); <u>Miller v. Lomax</u>, 596 S.E.2d 232, 242 (Ga. App. 2004).

CFI moves for summary judgment on the ground that plaintiff cannot establish a "transfer" of an "asset" from CMC to CFI.  CFI argues that CMC was not a party to the stock transaction between

Coe and CFI, and therefore CMC transferred no assets. However, plaintiff's cause of action is premised on the theory that the stock sale transferred Coe ownership and control from CMC to CFI. In other words, plaintiff relies on an indirect transfer of assets - controlling ownership of Coe stock - through corporate restructuring.

CFI nevertheless argues that plaintiff cannot rely on this theory, because the transfer of Coe stock to CFI did not result in the transfer of ownership from CMC to CFI. Rather, CFI argues that CMC remained the 100 percent owner of Coe's common stock from the time it acquired Coe until its assets were sold in bankruptcy. CFI explains that while the Coe stock purchase gave CFI the *option* to convert the stock into Coe common stock, ownership of Coe would not be transferred to CFI unless CFI exercised its right of conversion. Because CFI never elected to convert its preferred stock, CFI argues that there was no transfer of Coe ownership to CFI and thus no transfer of assets.

The only evidence CFI cites in support of this fact is the declaration of Willem de Vogel, in which he states that CFI did not elect to convert its stock. Prothro Decl., Ex. 1, p. 5 (de Vogel Decl.). However, plaintiff presents numerous documents in which TCR and CMC represent that CMC's sole asset was its three percent interest in Coe stock, because conversion was presumed. See Richter Decl., Ex. 6, p. 17 (Wright Dep. p. 116) (as a result of

CFI cash infusion, CMC's stock ownership in Coe was diluted to 3%),
Ex. 26; Declaration of Fred Fields, Ex. 12; Prothro Decl., Ex. 11,
p. 2. Further, James Wojtila, CMC's former Chief Financial
Officer, testified repeatedly before the bankruptcy trustee that
CMC's assets were limited to its three percent diluted interest in
Coe stock. Richter Decl., Ex. 27, pp. 3, 5, 15, 25, 38.
Therefore, a question of fact exists as to whether the Coe stock
purchase "transferred" a controlling interest in Coe to CFI.

Next, CFI argues that CMC had no "assets" to transfer, because
all of Coe's assets were encumbered by debt senior to that owed to
plaintiff. The UFTA excludes from the definition of "assets"
property of a debtor that is subject to a valid lien. DEL. CODE ANN.
tit. 6 § 1301(2)(a); OHIO REV. CODE ANN. § 1336.01(B)(1); Or. Rev.
Stat. § 95.200(2)(a). CFI maintains that all of Coe's assets were
pledged to GMAC to secure the $20 million in financing provided to
CMC and Coe. Therefore, CFI contends that plaintiff cannot assert
a claim for fraudulent transfer. See Kellstrom Bros. Painting v.
Carriage Works, 117 Or. App. 276, 279, 844 P.2d 221, 222 (1992) (no
means to void transfer where debtor's assets were encumbered by
valid security interest).

However, for CFI's theory to prevail, the security interest
must have attached to CMC's assets rather than Coe's, although the
court acknowledges that CMC's only asset was Coe. Even if the
court were to look at Coe's assets, plaintiff argues that their

value exceeded the amount of the GMAC lien. CFI maintains that plaintiff presents no credible evidence of Coe's value, and therefore the court must find as a matter of law that Coe's value did not exceed the amount of senior debt. However, CFI does not point to evidence of Coe's valuation, and the fact that all of Coe's assets are encumbered to secure the GMAC debt does not demonstrate the value of such assets. If CFI had presented evidence of valuation, plaintiff's perfunctory expert declaration likely would not raise a question of fact. Given the lack of evidence from either party and construing all inferences in favor of plaintiff, I cannot find as a matter of law that there was no transfer of assets within the meaning of the UFTA.

Finally, CFI argues that plaintiff cannot establish causation, because CMC's inability to pay him under the Seller Note was not caused by the transfer of Coe stock. Rather, CFI maintains that Coe's financial straits and the senior indebtedness to GMAC caused CMC's inability to meet any obligation owed to plaintiff. However, CFI's argument goes to the value of Coe's assets, a fact that cannot be resolved on this record. Moreover, plaintiff not only argues that the stock transfer rendered CMC unable to pay him, but also that the transfer foreclosed any remedy plaintiff may have had for CMC's breach. At the close of evidence, CFI will have the opportunity to persuade the court that this is a distinction without a difference. For now, plaintiff's claim may proceed.

<u>C.  The Funds' Motion for Summary Judgment</u>

   <u>1.  Shareholder Liability</u>

   Plaintiff alleges claims of shareholder liability against the
Funds in order to hold them liable for CMC's alleged breaches of
contract and CFI's fraudulent transfers.  The Funds move for
summary judgment, arguing that they did not control or dominate
CMC, CFI, or Coe; that TCR Friends III and TCR Co-Investors cannot
be held liable because they are minority shareholders; and that TCR
Co-Investors held no shares of CFI.

   Piercing the corporate veil is an equitable principle that
allows a creditor to disregard a corporation and hold its
controlling shareholders personally liable for the corporate debt.
<u>McClaran v. Plastic Indus., Inc.</u>, 97 F.3d 347, 358 (9th Cir. 1996);
<u>Amfac Foods, Inc. v. Int'l Systems & Controls Corp.</u>, 294 Or. 94,
654 P.2d 1092 (1982).  Three criteria generally must be met to
impose liability under veil-piercing or alter ego theories: 1) the
shareholder must have controlled the corporation; 2) the
shareholder must have engaged in improper conduct in the exercise
of control over the corporation; and 3) the shareholder's improper
conduct must have caused plaintiff's inability to obtain an
adequate remedy from the corporation.  <u>Rice v. Oriental Fireworks
Co.</u>, 75 Or. App. 627, 632, 707 P.2d 1250, 1255 (1985); <u>Wallace ex.
rel. Cencom Cable Income Partners II v. Wood</u>, 752 A.2d 1175, 1184
(Del. Ch. 1999); <u>Belvedere Condominium Unit Owners' Assn. v. R.E.</u>

Roark Cos., Inc., 617 N.E.2d 1075, 1085 (Ohio 1993). Improper conduct may include: 1) undercapitalization; 2) absence of corporate records; 3) fraudulent representation by shareholders or directors; 4) use of the corporation to promote fraud; 5) payment by the corporation of individual obligations; 6) commingling of assets; 7) failure to observe required corporate formalities; or 8) abuse or disregard of the corporate form. See Leonard v. McMorris, 63 P.3d 323, 330 (Colo. 2003); PanAmerican Mineral Servs. Inc. v. KLS Enviro Resources, Inc., 916 P.2d 986, 990 (Wyo. 1996); Fina Oil and Chem. Co. v. Amoco Prod. Co., 673 So.2d 668, 673 (La. App. 1996); Mid-Century Ins. Co. v. Gardner, 11 Cal.Rptr.2d 918, 922 n.3 (Cal. App. 1992); Amfac Foods, Inc., 294 at 109-10, 654 P.2d at 1101-02.

Plaintiff alleges that he has established a prima facie case of shareholder or alter ego liability, because the Funds: 1) controlled CMC and CFI; 2) caused CMC to dilute CMC's stock ownership in Coe through the issuance of Coe preferred stock to CFI; 3) formed CFI for the purpose of effectuating the cash infusion and stock transfer; and 4) caused CMC to approve the stock issuance to deprive plaintiff of a remedy against CMC for breach of the Seller Note and Guaranty. Plaintiff maintains that the Funds failed to invest adequate capital in Coe, failed to observe corporate formalities, and manipulated the corporate form to avoid liability to plaintiff.

TCR Friends III and TCR Co-Investors move for summary judgment, arguing that they were not majority shareholders in either CMC or CFI. Apparently, each held two percent or less of CMC stock. TCR Friends III holds a similar percentage of CFI stock, and TCR Co-Investors holds no CFI stock.

Plaintiff responds that controlling ownership is not a necessary prerequisite to shareholder liability; rather, it is the manner of control exercised by the shareholder that is determinative of liability. I agree. Although a controlling interest in a corporation is one factor to consider in deciding whether to pierce the corporate veil, courts also look to the actual exercise of control by the shareholders. See <u>Oregon Public Employees' Retirement Bd. v. Simat, Helliesen & Eichner</u>, 191 Or. App. 408, 430-31, 83 P.3d 350, 363 (2004).

However, I agree that TCR Co-Investors cannot be held liable as a shareholder of CFI absent evidence that it possesses an interest in CFI. Plaintiff maintains that a question of fact exists as to whether TCR Co-Investors is a shareholder of CFI. Plaintiff relies on Wright's deposition testimony that he thought the shareholders of CMC and CFI were the same. Richter Decl., Ex. 6, p. 16 (Wright Dep. p. 114). Plaintiff presents no actual evidence that TCR Co-Investors was or is a shareholder of CFI. Thus, Wright's lack of knowledge about CFI shareholders, though troubling, does not raise a genuine question of fact when Wright

was unaware that he was a director of CFI.  Id. at p. 14 (Wright Dep. p. 111).  Plaintiff also points to the alleged irregularities in the issuance of CMC stock certificates on April 16, 2002. However, plaintiff fails to explain how irregular CMC stock certificates has any bearing on whether TCR Co-Investors is a shareholder of CFI.

The Funds also argue that shareholder liability cannot be premised on undercapitalization of CMC or Coe, because the Funds wired a total of $30 million into CMC on April 28, 2000, providing adequate capitalization of Coe and fulfilling the terms of the Stock Purchase Agreement.  Plaintiff responds that the Stock Purchase Agreement required an *equity investment* in the form of $25 million from CMC shareholders, i.e., the Funds.  Plaintiff argues that the Funds did not comply with this provision of the Agreement, because the money was provided in the form of a loan. Undercapitalization is one of many factors in determining whether to pierce the corporate veil rather than "a separate piercing theory."  Salem Tent & Awning Co. v. Schmidt, 79 Or. App. 475, 482, 719 P.2d 899, 903 (1986).  Therefore, I do not consider this issue to be dispositive and will allow plaintiff to present such evidence at trial.

The Funds next argue that they were mere investors in CMC and CFI, and that there is no evidence that the Funds exercised control over CMC or CFI for the purpose of committing a fraud.  The Funds

emphasize the undisputed facts that they, CMC, and CFI shared no bank accounts and commingled no assets. This argument might be more convincing if CMC or CFI were corporations that manufactured or sold products, performed some type of service, or actually did anything. Instead, CMC and CFI are holding corporations with no employees, no assets (other than Coe stock), no offices, and no known bank accounts or corporate policies or procedures. Richter Decl., Ex. 11, p. 5 (Welsh Dep. p. 21). Indeed, these corporations exist only on paper, and the "operations" of either company appear to have been the purchase of Coe and the authorization and issuance of Coe convertible preferred stock, all of which was approved by the Funds as CMC and CFI shareholders. I recognize that holding companies are entitled to the same legal protections as any other corporate structure. Nevertheless, the Funds cannot point to the lack of shared bank accounts or commingled assets when there are no real assets to commingle and no bank accounts known to the court.

I also recognize that the Funds' capital financing and performance monitoring of CMC and CFI does not generally support shareholder liability. See Doe v. Unocal Corp., 248 F.3d 915, 926 (9th Cir. 2001). At the same time, however, the court must look to the specific facts of each case when determining shareholder or alter ego liability. Legacy Wireless Servs., Inc. v. Human Capital, L.L.C., 314 F. Supp. 2d 1045, 1058 (D. Or. 2004). When construed in favor of plaintiff, the totality of the circumstances

lead the court to believe that this matter is best left to the trier of fact.

It is undisputed that the Funds owned over ninety-five percent of CMC stock at the time CMC approved the issuance of Coe preferred stock to CFI. Further, TCF III, who owns a controlling interest in CMC, formed CFI by purchasing CFI stock for $3,000,000. In turn, CFI received newly-issued Coe convertible preferred stock in exchange for a $3,000,000 cash infusion. Thus, the Funds' investment interests were not affected detrimentally, because they remained the owner of the company that held a controlling equity interest in Coe but had no liability to plaintiff. Further, de Vogel admitted that he wore "different hats" and that "wearing [his] hat as a fiduciary for the fund" led to his decision to form CFI in order to protect the Funds' investment. Richter Decl., Ex. 1, pp. 8, de Vogel Dep., pp. 34. Only a few months after the Coe stock transaction, CMC filed for bankruptcy, thus preventing plaintiff from obtaining any real remedy from CMC. CMC representatives have admitted that CMC filed for bankruptcy to end the litigation with plaintiff. Richter Decl., Ex. 5, p. 5 (Wojtila Dep., p. 141); Ex. 27 pp. 26-27 (Wojtila testimony before bankruptcy trustee).

Additionally, questions of fact exist as to whether corporate formalities were followed with respect to CMC, the formation of CFI, and the subsequent purchase of Coe preferred stock. De Vogel

was President of TCR and CFI and was a managing member of the general partner of the Funds. Wright was a TCR executive and a director of both CMC and CFI. Welsh, TCR corporate counsel, was also a director for both CMC and CFI. The Funds, CMC, and CFI share TCR's address and place of business, and corporate records for CMC and CFI are kept at TCR offices. Richter Decl., Ex. 11, pp. 5, 9 (Welsh Dep. pp. 21, 39). CMC had no employees and prior to the Coe purchase, it held no assets. Id. CFI has no employees and no assets other than the Coe preferred stock. Id. at p. 11 (Welsh Dep. p. 46). CMC and CFI board meetings generally were held at TCR offices. Id. at pp. 6, 10 (Welsh Dep. pp. 25, 40.)

According to the deposition testimony of Welsh, de Vogel requested that she effectuate the formation of CFI in early 2002, and she, Wright, and de Vogel were named directors. Richter Decl., Ex. 11, p. 12 (Welsh Dep. p. 51). However, Wright testified that he was unaware that he was even named a member of the board until he was informed by plaintiff's counsel at his deposition. Richter Decl., Ex. 6, pp. 14-15 (Wright Dep. pp. 111-12). Wright recalls attending no board meetings or signing resolutions or documents on behalf of CFI. Id. Wright did not even remember discussing CFI or the purpose for forming the corporation. Id. at 14 (Wright Dep. p. 111).

Construing all inferences in favor of plaintiff, it is not inconceivable that a trier of fact could find that the Funds

controlled CMC and CFI through TCR and de Vogel and abused the corporate form in the formation of CFI and issuance of Coe preferred stock for the purpose of denying plaintiff a remedy for CMC's alleged breach of the Seller Note; i.e, to "moot the dispute" with plaintiff, as de Vogel represented to Fund investors.  <u>See</u> Richter Decl., Ex. 20.

While the Funds place great emphasis on plaintiff's misapprehension that TCR - as opposed to the Funds - owned CMC and CFI, I do not find plaintiff's deposition testimony dispositive. TCR acted on behalf of the Funds, CMC, CFI, and sometimes Coe. Indeed, de Vogel admits that he wears "different hats" in his various positions with the TCR entities, the Funds, and their portfolio companies.  Richter Decl., Ex. 1 p. 16 (de Vogel Dep. p. 50).  Furthermore, de Vogel, the purported managing member of the general partner of the Funds and the moving force behind TCR, is unable explain the legal structure of the various entities.  At his deposition, de Vogel testified that the legal structure of the Funds was "complicated" and that he likely would need an organizational "chart" to explain it.  <u>Id.</u> at pp. 14, 16-18, 20 (de Vogel Dep. pp. 48, 50-51, 54).  Nor could de Vogel recall the name of the company for whom he is the managing member and which is the general partner of the Funds.  Richter Decl., Ex. 1, p. 14 (de Vogel Dep., p. 48).  This testimony does not exactly inspire confidence.

Instead, the fact that de Vogel wears many "hats" in representing, rendering advice, and making decisions for TCR, the Funds, and their portfolio companies only raises further questions regarding adherence to corporate formalities and respect for the corporate form.

> The corporate form was not intended to be a device by which persons could engage in business without obligation or risk. The privilege of limited liability of the shareholders of a business corporation carries with it the obligation to conduct business as a corporation, and abuse of the privilege may create personal liability for the act of the corporation.

Amfac Foods, Inc., 294 Or. at 101, 654 P.2d at 1097 (citation omitted).

Accordingly, the Funds' motion for summary judgment regarding plaintiff's shareholder liability claims is denied, except for plaintiff's shareholder liability claim against TCR Co-Investors as a shareholder of CFI.

### 2. Tortious Interference With Contract

Next, the Funds move for summary judgment against plaintiff's claim of tortious interference against them. Plaintiff's claim is premised on the theory that TCR was acting on behalf of the Funds in an agency capacity when uttering defamatory statements about plaintiff.

For the reasons explained above, issues of fact preclude summary judgment on plaintiff's claim of tortious interference based on TCR's allegedly slanderous statements regarding

plaintiff's misrepresentations and fraudulent conduct.  Likewise, issues of fact remain regarding the precise agency relationship between TCR and the Funds and whether de Vogel was acting on behalf of the Funds in order to protect their investment in CMC and Coe. The Funds' motion is granted with respect to plaintiff's claim based on the transfer of Coe stock to CFI.

## D.  Plaintiff's Motion for Summary Judgment

Plaintiff moves for summary judgment against CFI's alleged remedy for rescission.  Plaintiff argues that CMC's counterclaims against him are not assignable, and therefore CFI cannot assert them against plaintiff or seek rescission of the Stock Purchase Agreement.  Plaintiff further maintains that rescission is unavailable because CMC failed to unequivocally elect to rescind and CMC waived rescission by taking action inconsistent with rescission, such as affirming its agreements with plaintiff and altering Coe to the extent that plaintiff could not be returned to his precontractual position.

The parties' submissions on summary judgment do not alter the court's previous conclusion that CFI counterclaims must be resolved by the trier of fact.  Whether CMC could assign its right of rescission, whether return to the status quo is possible, whether CMC's actions have been inconsistent with rescission, and whether rescission is available are questions of fact that cannot be decided based on the current record before the court.

<u>CONCLUSION</u>

Defendant Coe Funding Inc.'s Motion for Summary Judgment (doc. 184) is DENIED. Defendants TCF III, TCR Friends III, and TCR Co-Investors III's Motion for Summary Judgment (doc. 187) is GRANTED with respect to plaintiff's shareholder liability claim against TCR Co-Investors as shareholder of CFI and DENIED in all other respects. Defendant TCR's Motion for Summary Judgment (doc. 190) is GRANTED with respect to plaintiff's tortious interference claim based on the transfer of Coe stock and DENIED in all other respects. Plaintiff's Motion for Summary Judgment (doc. 193) is DENIED. Defendants' Motion to Strike (doc. 246) is DENIED as moot. IT IS SO ORDERED.

Dated this _14____ day of April, 2005.


<u>/s/ Ann Aiken</u>
Ann Aiken
United States District Judge